ROBAINA & KRESIN PLLC
5343 North 16th Street, Suite 200
Phoenix, Arizona 85016-3231
Telephone: (602) 682-6450
Facsimile:  (602) 682-6455
dck@robainalaw.com
David C. Kresin (019858)
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| Mildred Jane Lindner, an individual, | |
|---|---|
| Plaintiff, | No. |
| vs. | **COMPLAINT** |
| Foundation for Senior Living, an Arizona corporation, | (Jury Trial Demanded) |
| Defendant. | |

Plaintiff Mildred Jane Lindner, by and through her counsel, alleges as follows:

1. This action is brought pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("the FMLA"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("the ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* ("the Rehab Act").

2. Plaintiff Mildred Jane Lindner is a resident of Maricopa County, Arizona.

3. Defendant Foundation for Senior Living ("the Foundation") is a private, nonprofit agency in Phoenix, Arizona.

4. The Foundation receives or distributes federal financial assistance through Medicare or otherwise.

5. The Court has jurisdiction over this case pursuant to 29 U.S.C. § 2617(a)(2) and 28 U.S.C. § 1331.

6. Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391.

7. Ms. Lindner is a registered nurse with her Bachelor of Science in Nursing degree.

8. The Foundation employed Ms. Lindner for over 17 years in the position of Administrator of the Home Health Agency until approximately December 19, 2017, when the Foundation terminated Ms. Lindner's employment.

9. In her position as Administrator, Ms. Lindner oversaw a staff of 50 for the Foundation.

10. Ms. Lindner performed her job well and receiving positive feedback for her performance throughout her employment until May 2017, when she was diagnosed with a disability and began needing leave to accommodate her disability.

11. Specifically, in May 2017, Ms. Lindner was diagnosed with lupus.

12. By June 2017, Ms. Lindner sought intermittent leave due to her episodic flare ups and the need for treatment of the lupus. Ms. Lindner occasionally used the intermittent leave throughout the Summer of 2017.

13. On Friday, August 11, 2017, Ms. Lindner was taken to the emergency room due to diverticulitis, diaphoresis and abdominal pain secondary to the lupus. Because of those conditions, Ms. Lindner was temporarily unable to work and immediately sought a leave of absence from the Foundation.

14. While out on medical leave, Ms. Lindner was forced to go to work to meet with Human Resources Director Patricia Cordova and Ms. Lindner received calls from work almost daily.

15. Specifically, on Tuesday, August 15, Ms. Cordova called Ms. Lindner and told her that Ms. Lindner needed to meet with Ms. Cordova as soon as possible to discuss a "business continuity plan" for the agency. When Ms. Lindner resisted due to her medical condition, Ms. Cordova insisted that they meet immediately.

16. Because Ms. Lindner remained very ill and suffering severe diarrhea, Ms. Lindner did not want Ms. Cordova coming into her home so Ms. Lindner agreed to meet Ms. Cordova at the office the next morning.

17. On Wednesday, August 16, Ms. Lindner arrived at 9:30 am to meet with Ms. Cordova. At that point, Ms. Lindner learned that Ms. Cordova would not arrive to the office until later. Ms. Lindner still felt very ill and made a number of trips to the bathroom while she waited for Ms. Cordova. Several other employees saw how sick Ms. Lindner was and encouraged her to go home, but she stayed to meet Ms. Cordova as directed.

18. While Ms. Lindner was waiting, Chief Operating Officer Carrie Smith walked by and Ms. Lindner asked her about the purpose of the meeting. Ms. Smith feigned ignorance, stating she knew nothing about it.

19. Ms. Cordova ultimately arrived at the office at approximately 11:00 am. After Ms. Lindner went into Ms. Cordova's office, Ms. Cordova closed the door and stated "let me pull up this email from Carrie [Smith]." Ms. Cordova then began discussing that Ms. Lindner would not be around forever and they needed to prepare a business continuity plan to "protect Carrie".

20. In the meeting, Ms. Cordova then made several suggestions including that Ms. Lindner consider job sharing or reversing roles with her subordinate, the Assistant Administrator. Ms. Lindner indicated that she was not willing to give up her position and expected to continue in her position. Ms. Cordova then indicated that Ms. Smith wanted someone else in the Administrator role.

21. The meeting lasted approximately 45 minutes, then Ms. Cordova suggested Ms. Lindner go out the back door. Ms. Lindner felt significant stress because of the meeting she was forced to attend with Ms. Cordova.

22. Over the next four days, because of the stressful meeting, Ms. Lindner became much sicker with increasing diarrhea and intestinal bleeding.

23. On approximately August 20, Ms. Lindner's medical provider certified that her anticipated return-to-work date would be September 30, 2017.

24. Throughout her leave of absence, Ms. Lindner received work-related calls from the Foundation. For example, Ms. Lindner spoke with the Assistant Administrator Ruth Faultner, nearly every afternoon.

25. On Monday, September 25, Ms. Faultner called Ms. Lindner because she could not log in to the CMS website. After Ms. Lindner was not able to help her over the phone, Ms. Lindner agreed to come in to the office the next day to help her get signed up. Ms. Lindner did so the following day and, while in the office, she notified others, including [Ms. Cordova/Ms. Smith?] that she was getting better and planned to see her physician on September 28 to obtain a release to return to work.

26. On Thursday, September 28, while Ms. Lindner was in the exam room at her primary care physician, she received a call from Ms. Cordova and Ms. Lindner told her she would call her back. In that appointment, Ms. Lindner's physician approved her return to work on Monday, October 2.

27. Immediately after leaving her medical appointment, Ms. Lindner returned Ms. Cordova's call and notified Ms. Cordova that she would be returning to her position on October 2. In that call, Ms. Cordova informed her that the Foundation would be moving her to the position of Assistant Administrator—a demotion—while assuring her that the move was not at all related to her job performance.

28. During that call, Ms. Cordova stated that Ms. Lindner's job was a "key position" but did not explain what that meant or why it was significant. Ms. Lindner never received a written notice of the Foundation's intent to deny Ms. Lindner restoration to her prior position.

29. Neither Ms. Cordova nor anyone else at the Foundation ever notified Ms. Lindner orally or in writing that she was a "key employee" subject to potential limitations on reinstatement under the FMLA.

30. Neither Ms. Cordova nor anyone else at the Foundation ever notified to Ms. Lindner orally or in writing that a reinstatement may be denied to a key employee if reinstatement would cause substantial and grievous economic injury to the employer.

31. Neither Ms. Cordova nor anyone else at the Foundation ever notified Ms. Lindner orally or in writing that the employer determined some substantial and grievous economic injury would result from Ms. Lindner's restoration or what that injury was.

32. In the September 28 call, Ms. Cordova justified the move by stating that Ms. Lindner would not need to work as many hours per week in her new position.

33. On Monday, October 2, Ms. Lindner arrived at work and met with Ms. Cordova, Ms. Smith and Ms. Faultner to discuss her return. At that point, Ms. Cordova suggested that Ms. Lindner could either return as the Assistant Administrator or in a Special Projects position.

34. On Tuesday, October 3, Ms. Lindner returned to work and informed Ms. Cordova that she was not qualified to act as the Assistant Administrator because that is a Director of Nursing role and she had not performed those duties in over 27 years. Accordingly, the Foundation placed her in the Special Projects position.

35. After several days, Ms. Cordova provided a job description for the Special Projects position and attempted to change Ms. Lindner to a part-time position with no benefits. When Ms. Lindner protested to Ms. Smith, the Foundation changed it to a full-time hourly position. In any event, Ms. Lindner worked in that position until her termination.

36. On Tuesday, December 5, Ms. Lindner received an electronic meeting invitation from Ms. Smith to meet with Ms. Cordova, Ms. Smith and Ms. Faultner to discuss "transition."

37. On Wednesday, December 6, Ms. Cordova, Ms. Smith and Ms. Faultner met with Ms. Lindner and Ms. Cordova told her that the Special Projects position had always been temporary and that the position would end on January 31, 2018. Ms. Smith likewise stated the Special Projects position was "always temporary."

38. When Ms. Cordova asked Ms. Lindner what she wanted to do, Ms. Linder stated that she wanted to return to her previous position as Administrator of the Home

Health Agency. In response, Ms. Cordova implied that Ms. Lindner's employment was ending and indicated that Ms. Lindner would likely be given some severance pay.

39. On December 19, 2017, the Foundation terminated Ms. Lindner's employment effective immediately.

40. On January 15, 2018, Ms. Lindner filed a charge of discrimination with the Equal Employment Opportunity Commission ("the EEOC") alleging disability discrimination and retaliation for seeking a reasonable accommodation, all in violation of the ADA.

41. At Ms. Lindner's request, on January 31, 2018, the EEOC issued a Notice of Right to Sue.

42. As a result of the Foundation's conduct, Ms. Lindner has suffered and continues to suffer lost income, lost fringe benefits, medical expenses, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

**COUNT ONE**
**(Interference with Rights under the FMLA)**

43. Ms. Lindner incorporates all previous allegations as though set forth fully herein.

44. At all relevant times, the Foundation was an employer within the meaning of the FMLA.

45. At all relevant times, Ms. Lindner was an eligible employee within the meaning of the FMLA.

46. The Foundation violated the FMLA by requiring Ms. Lindner to attend meetings and perform work during her medical leave of absence.

47. The Foundation additionally violated the FMLA by failing to reinstate Ms. Lindner to the same or equivalent position that she held prior to the medical leave.

48. To the extent the Foundation claims that Ms. Lindner met the definition of "key employee", the Foundation further violated the FMLA by failing to notify Ms.

Lindner in writing at the time of the leave request, or as soon as practicable thereafter, that the Foundation had determined that she was a key employee and that the Foundation may deny reinstatement if it would cause substantial and grievous economic injury to the employer but the denial will not diminish the employee's rights to health information.

49. To the extent the Foundation claims that Ms. Lindner's reinstatement would have caused a substantial and grievous economic injury to the employer, the Foundation further violated the FMLA by (1) failing to make that determination as soon as possible; (2) failing to notify Ms. Lindner in writing at the time of that determination that the Foundation intended to deny reinstatement upon completion of the FMLA leave; (3) failing to provide notice to Ms. Lindner in writing of the basis for the determination that reinstatement would cause a substantial and grievous economic injury to the employer; (4) failing to give Ms. Lindner a reasonable time to elect to return to work after notice of the determination; and (5) failing to give Ms. Lindner an additional opportunity to request reinstatement to her prior position at the end of her leave.

50. As a result of the Foundation's conduct, Ms. Lindner has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

**COUNT TWO**
**(Discrimination in violation of the FMLA)**

51. Ms. Lindner incorporates all previous allegations as though set forth fully herein.

52. The Foundation terminated Ms. Lindner's employment because she exercised her right to take FMLA-protected leave.

53. As a result of the Foundation's conduct, Ms. Lindner has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress,

pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

**COUNT THREE**
**(Disability Discrimination in Violation of the ADA)**

54. Ms. Lindner incorporates all previous allegations as though set forth fully herein.

55. Ms. Lindner is an employee and the Foundation is an employer under the ADA.

56. From May 2017 through the end of her employment with the Foundation, Ms. Lindner was an individual with a disability under the ADA in that at all relevant times she had a physical impairment that substantially limited one or more major life activities including limitations on the following systems: immune system, digestive system, gastrointestinal system, joints, skin, kidneys, blood cells, brain, heart and lungs.

57. From May 2017 through the end of her employment with the Foundation, Ms. Lindner could perform the essential functions of the job she was hired to perform, with or without a reasonable accommodation.

58. By June 1, 2017, the Foundation knew of Ms. Lindner's disability.

59. Ms. Lindner's requested accommodations were not an undue hardship to the Foundation.

60. The Foundation violated the ADA by failing to engage in the interactive process and failing to honor the necessary and reasonable accommodation of a medical leave of absence.

61. The Foundation further violated the ADA by demoting Ms. Lindner and ultimately terminating Ms. Lindner's employment because of her disability and need for reasonable accommodations.

62. As a result of the Foundation's conduct, Ms. Lindner has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of

enjoyment of life.

## COUNT FOUR
## (Retaliation under the ADA)

63. Ms. Lindner incorporates all previous allegations as though set forth fully herein.

64. The Foundation retaliated against Ms. Lindner in violation of the ADA by demoting her and ultimately terminating her employment because she engaged in protected activity, including requesting and taking leave as a reasonable accommodation.

65. As a result of The Foundation's conduct, Ms. Lindner has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

## COUNT FIVE
## (Disability Discrimination in Violation of the Rehabilitation Act)

66. Ms. Lindner incorporates by reference all previous allegations as though set forth fully herein.

67. The Foundation is subject to the requirements and strictures of the Rehab Act pursuant to 29 U.S.C. § 794.

68. From May 2017 through the end of her employment with the Foundation, Ms. Lindner was an individual with a disability under the Rehab Act in that at all relevant times she had a physical impairment that substantially limited one or more major life activities including limitations on the following systems: immune system, digestive system, gastrointestinal system, joints, skin, kidneys, blood cells, brain, heart and lungs.

69. From May 2017 through the end of her employment with the Foundation, Ms. Lindner could perform the essential functions of the job she was hired to perform, with or without a reasonable accommodation.

70. By June 1, 2017, the Foundation knew of Ms. Lindner's disability.

71. Ms. Lindner's requested accommodations were not an undue hardship to the Foundation.

72. The Foundation violated the Rehab Act by failing to engage in the interactive process and failing to honor the necessary and reasonable accommodation of a medical leave of absence.

73. The Foundation further violated the Rehab Act by demoting Ms. Lindner and ultimately terminating Ms. Lindner's employment because of her disability and need for reasonable accommodations.

74. As a result of the Foundation's conduct, Ms. Lindner has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

## COUNT SIX
### (Retaliation under the Rehabilitation Act)

75. Ms. Lindner incorporates all previous allegations as though set forth fully herein.

76. The Foundation retaliated against Ms. Lindner in violation of the Rehab Act by demoting her and ultimately terminating her employment because she engaged in protected activity, including requesting and taking a reasonable accommodation.

77. As a result of The Foundation's conduct, Ms. Lindner has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

78. Ms. Lindner demands a jury trial on all claims and issues set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mildred Jane Lindner prays for judgment against Defendant Foundation for Senior Living as follows:

A. For an award of economic damages in an amount sufficient to make Plaintiff whole for past and future lost income and benefits and other economic losses suffered by Plaintiff resulting from Defendant's conduct;

B. For an award of compensatory damages for mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation, loss of enjoyment of life and other losses incurred by Plaintiff as a result of Defendant's conduct;

C. For an award of liquidated damages under the FMLA;

D. For an award of attorneys' fees and related expenses;

E. For an award of prejudgment and post-judgment interest;

F. For an award of Plaintiff's costs of suit incurred herein; and,

G. For an award of such other relief as the Court may deem just and proper.

DATED this 26th day of February, 2018.

ROBAINA & KRESIN, P.L.L.C.

By _____
David C. Kresin
Attorneys for Plaintiff